**In re BMR, INC., Debtor.**

**FIRST MONTGOMERY BANK, a corporation, Plaintiff,**

**v.**

**SLOCOMB NATIONAL BANK, a National Banking Association, Defendant.**

**Bankruptcy No. 84–01641.**

**Adv. No. 85–0039.**

United States Bankruptcy Court, M.D. Alabama, S.D.

Aug. 2, 1985.

applicable in any court applying Alabama law,

where lower court settlements are in question.

Frederick T. Enslen, Montgomery, Ala., for First Montgomery Bank, plaintiff.

Charles W. Fleming, Jr., Geneva, Ala., for Slocomb Nat. Bank.

Tom McGregor, Montgomery, Ala., trustee.

## OPINION ON COMPLAINT TO RECLAIM

RODNEY R. STEELE, Bankruptcy Judge.

### THE CASE

The First Montgomery Bank (FMB) seeks in this proceeding to require the Slocomb National Bank (SNB) to turn over to FMB certain inventory consisting of fans, lights and fireplace devices. Both banks claim a valid and perfected security interest in this inventory, which is located in a store on Ross Clark Circle in Dothan, Alabama.

Trustee makes no claim to the inventory. But the banks agreed to submit the question of priority to this court, and it was submitted as of June 18, 1985, after an evidentiary hearing, and the filing of briefs.

### FINDINGS

1. BMR, Inc. was organized as a merchant, selling fans, fireplaces and the like, at Montgomery sometime before August 30, 1983. The company was owned by Richard Zuck and Gayla Zuck.

2. On or about August 30, 1983, BMR pledged its inventory to FMB for a loan and FMB filed with the Secretary of State of Alabama, a UCC–1 statement, showing "BMR, Inc., 5770–C Bell Road, Montgomery, Alabama 36116." The filing covered "all accounts receivable and inventory, including, but not limited to fans, lighting, wood stoves, fire accessories, telephones,

and all brass items. This financing statement also covers future advances."

3. After this secured transaction, Zuck and a man named Thrasher opened a similar business in Dothan, Alabama, called "A Fan 'N Fireplace." The FMB knew of this store, and Zuck apparently arranged with FMB for some supplying of inventory to this store. This was from March through May, 1984.

4. In June, 1984, Zuck and Thrasher borrowed $10,000 from SouthTrust Bank of Dale County, for the Dothan store, and executed a UCC–1 in the name of "Zuck, Richard D., Thrasher, Tommy, A Fan 'N Fireplace—BMR, Inc., 1795 Ross Clark Circle, SE, Dothan, Alabama 36301." This UCC–1 was recorded in Houston County, Alabama and with the Secretary of State on August 24, 1984.

5. On July 7, 1984, Zuck obtained a loan for "BMR, Inc., A Fan 'N Fireplace" from SNB for $21,000, and an additional $3,500 advanced on July 14, 1984. SNB took a security interest in "inventories of business known as A Fan 'N Fireplace located at 1795 Ross Clark Circle, SE, Dothan, Alabama."

SNB recorded this financing statement with the Secretary of State on July 11, 1984. The debtor was listed as "BMR, Inc., 4429 Troy Highway, Montgomery, Alabama 36116."

Zuck told SNB that "A Fan 'N Fireplace" was a subsidiary of BMR.

6. Thrasher and Zuck became involved in litigation involving the Dothan store, and SNB discovered that Zuck had made several misrepresentations to SNB. The lawsuit was eventually settled, but during its pendency, the business was placed under the supervision of the Circuit Court of Houston County, Alabama, and Mr. Kermit Tanton was appointed as a receiver or trustee.

7. When the lawsuit was settled, the agreement provided that Zuck was to re-execute his indebtedness to SNB and to pay off the SouthTrust Bank. Zuck signed another note and security agreement to SNB.

SNB, because of Zuck's previous misrepresentations, had Zuck execute a note and security agreement as follows: "Richard D. Zuck individually, Richard D. Zuck as sole proprietor, d/b/a A Fan 'N Fireplace, and BMR, Inc., by Richard D. Zuck, president."

This re-executed note was for $25,219.71. Zuck's security covered "all inventory, including after-acquired inventory, located at A Fan 'N Fireplace, 1795 Ross Clark Circle, SE, Dothan, Alabama."

8. Sometime in October or November of 1984, FMB took an inventory of the collateral of BMR, Inc. located at its store in Montgomery. Zuck assisted in this inventory, and FMB placed a value of $30,000.00 on it.

9. The testimony supports a finding that an agent of A Fan 'N Fireplace, in the fall of 1984, made several trips to Montgomery from Dothan in order to purchase inventory from BMR, Inc. The agent stated that on several occasions during that time, Zuck would make an appointment at First Montgomery Bank, the agent would meet a bank representative who would take him to BMR's place of business, unlock the door, supervise his obtaining inventory, and accept a check written on "A Fan 'N Fireplace" and made payable jointly to FMB and BMR, Inc.

10. On December 17, 1984, BMR, Inc. filed a Chapter 7 petition in bankruptcy. On January 23, 1985, FMB filed its motion to lift stay, and the stay was lifted by an order dated February 22, 1985.

11. Meanwhile, SNB, who was not listed as a secured creditor by BMR, Inc. and who had received no word or notice of any bankruptcy filing, discovered that Zuck had recently abandoned the Dothan store. SNB obtained possession of the store in early March, 1985, and repossessed the collateral and was about to sell it when it was advised by FMB that FMB claimed the inventory at Dothan. This litigation ensued.

12. It also appears that on July 9, 10, and 13, 1984, A Fan 'N Fireplace bought and paid for by checks, inventory from BMR, Inc.

## CONCLUSIONS

■ BMR, Inc., and the business known as "A Fan 'N Fireplace" were, at least after late June, 1984, when the Circuit Court of Houston County took over the Dothan store and appointed Mr. Kermit Tanton as receiver, a separate entity.

The evidence also supports a finding that after the store was taken over by the Circuit Court of Houston County, Alabama, the Dothan store was operated as a separate entity, individually owned by Zuck and operated separately by him. He had control over it and tried to manipulate it to the disadvantage of the SNB. He incorporated it, in fact, for that purpose.

He bought merchandise for that separate Dothan store from the BMR store in Montgomery, and FMB knew it, and in effect, refused to let the merchandise go until BMR, Inc. and its secured creditor, FMB, were paid.

The effect of the UCC–1 filing, then, by SNB on September 27, 1984, was to give SNB a first security interest on the inventory of the Dothan business, and a second security interest on the inventory of BMR, Inc.

2. The sales by BMR, Inc. to A Fan 'N Fireplace of inventory were sales in which "A Fan 'N Fireplace" took free of the security interest of FMB.

A creditor with a valid and perfected security interest in collateral continues to have that interest, even though the collateral is sold, exchanged or otherwise disposed of by the giver of security, but the security agreement may provide for disposition free of the security interest. Code of Alabama, 1975, Section 7–9–306(2).

And if the giver of security is a merchant seller, who deals in goods of the kind given as security, and he sells to one in the ordinary course of his business, then he is selling to "a buyer in the ordinary course of business," and that buyer in ordinary course, takes free of a security interest of

the secured creditor. Code of Alabama, 1975, Section 7–9–307(1); Section 7–1–201. There is an implicit right which the secured creditor is presumed to recognize, to sell free of the security interest.

The buyer in ordinary course may, however, lose that status if he knew that the sale to him was in violation of the security interest of the secured creditor, and if he bought not in good faith. Code of Alabama, 1975, Section 7–1–201(9). He would then take subject to the security interest.

■ In this case, "A Fan 'N Fireplace" was a buyer in the ordinary course of business from BMR. BMR was in the business of selling the kind of inventory collateral pledged to FMB. The inventory was sold in the usual course of BMR's business to A Fan 'N Fireplace.

That must result in a finding that "A Fan 'N Fireplace" took free of FMB's security interest and that SNB's security is valid and perfected and a first security interest on the Dothan inventory, unless "A Fan 'N Fireplace" purchased in knowing violation of FMB's security rights *and* not in good faith.

■ We cannot find that "A Fan 'N Fireplace" was guilty of either of these exceptions. In the first place, the Dothan entity, even though it knew of the security interest of FMB, bought from BMR (which had a good right as a merchant to sell free of the security interest) *and* paid for the inventory it bought from BMR. It was not buying in violation of any right of FMB.

3. "A Fan 'N Fireplace" also bought in good faith from BMR. It paid for the inventory it bought from BMR. And in several instances, it directly paid the FMB. See Defendant's Exhibit 1. And see the testimony of Segrest.

"Good faith" is defined as "honesty in fact in the conduct or transaction concerned." In this case, the cash sales, the "transactions concerned" were conducted honestly; there is no evidence that "A Fan 'N Fireplace" or its agents intended to bilk FMB or deceive FMB or to deplete the inventory of BMR to the detriment of FMB or any creditor of BMR. The payment for the goods in this case constitutes good faith, and avoids any question of fraudulent transfer.

The instructive opinion in *In re Del Tex Corp.*, (B.C.W.D.Tex., 1983) 32 B.R. 403, is distinguishable. The "good faith" of the buyer in ordinary course in that case was not established because credit sales between two entities, both merchants, were improperly handled by the common owner, with depletion of assets of the inventory of the giver of security. There was an obvious fraudulent transfer or transfers of the inventory of the giver of security. It was impossible to find good faith in that case.

For the reasons set out above, it must be concluded that the Dothan inventory is free of any security claim of the FMB, and is subject to the valid and perfected first security interest of the Slocomb National Bank.

An appropriate order will enter.